[No. 5620.]

## WALKER v. BRUCE.

1. **Mines and Mining — "Mining Partnership" — Words and Phrases.**

A mining partnership exists where the several owners of a mine co-operate in the working of it.—P. 112.

2. **Mines and Mining—Mining Partnership.**

Plaintiff and defendant obtained a lease of mining property and a bond for its conveyance upon payment of a sum by a certain date, the time being extended for a consideration, each paying half; and, under the bond and lease, agreed to work the property jointly, each to bear one-half the expense, the defendant

putting in his own work, and plaintiff furnishing a man to do his share of the work. Held, that they were engaged in a joint enterprise for the purpose of carrying out the provisions of the bond and lease, and were equal partners in that respect.—P. 113.

3. **Statute of Frauds—Purpose of Statute—Fraud.**

A party can not allege or rely upon the statute of frauds for the purpose of committing fraud, since the statute is intended to prevent, and not to encourage, fraud.—P. 117.

4. **Trusts—"Resulting Trusts"—Words and Phrases.**

Resulting trusts, or those created by operation of law, arise, first, when an estate is purchased in the name of one person, but the money or consideration is given by another; second, where a trust is declared only as to part, and nothing is said as to the rest; and, third, in certain cases of fraud where transactions have been carried on mala fide.—P. 117.

5. **Trusts—"Constructive Trusts"—Words and Phrases.**

Constructive trusts are such as are raised by equity in respect to property which has been acquired by fraud; or where, although acquired without fraud, it is against equity that it should be retained by him who holds the legal title.—Pp. 117, 118.

6. **Statute of Frauds—Resulting Trusts—Parol Evidence.**

Resulting trusts are not within the statute of frauds, and may be shown by parol testimony.—P. 118.

7. **Trusts—Resulting Trusts.**

Plaintiff and defendant were members of a mining partnership formed for the purpose of working and obtaining title to a claim, with equal interests therein, under the terms of which each was to contribute equally to the expenses incident thereto; and, pursuant to the arrangement, plaintiff negotiated with the owner of the property, which they had previously leased, and purchased it outright, using his own money, but having the deed made to defendant. Held, that a resulting trust existed, defendant holding a one-half interest in the enterprise in trust for plaintiff.—P. 119.

*Appeal from the District Court of Chaffee County.*
*Hon. M. S. Bailey, Judge.*

Action by Gilbert A. Walker against H. T. Bruce. From a judgment for defendant, plaintiff appeals.

*Reversed and remanded, with directions*
*to enter a decree for plaintiff.*

Mr. G. K. HARTENSTEIN, for appellant.

Mr. C. A. WILKIN, for appellee.

Mr. JUSTICE BAILEY delivered the opinion of the court:

This action was brought by the appellant to obtain a decree compelling the appellee to convey to the plaintiff an undivided one-half interest in the Harvest Moon mining claim. The plaintiff contended that the circumstances under which the property was conveyed to the defendant were such as would amount to a trust in favor of plaintiff. The circumstances, as we gather them from the admissions, undisputed proof, and matters conclusively proven, are as follows: That on the eighth of September, A. D. 1903, Nelson Gaskill executed and delivered unto the plaintiff and defendant his lease of the property and bond for its conveyance upon the payment of five thousand dollars on or before the 15th day of November, 1903. The next day, in consideration of twenty-five dollars, Gaskill extended the option of purchase contained in such bond and lease until the 15th day of November, 1904. One-half of this twenty-five dollars was paid by plaintiff, and one-half by defendant. Under this bond and lease the parties agreed to work the property jointly, each to bear one-half of the expense. This matter is disputed by appellee in his brief and also, to some extent, in his testimony, but the allegation of the complaint is "that, pursuant to said bond and lease and in furtherance of their said enterprise, the plaintiff and defendant immediately entered into the joint possession of the said mining claim and commenced the development of same, each bearing and to bear one-half of the expenses of such development work and one-half of all other expenses in the furtherance of their said enterprise."

In relation to this matter, the defendant in his answer says that he admits that "pursuant to said title bond and lease he, the defendant, and the plaintiff, entered into possession of said Harvest Moon mining claim and commenced work and did work upon the same, and that he, the defendant, and the plaintiff, were to share the expenses of said work and development work equally—that is to say, that he was to put in his own work and the plaintiff was to furnish a man to represent him, the plaintiff, in the doing of an amount of work equal to that that should be done by the defendant." So we are constrained to believe that these people were engaged in a joint enterprise for the purpose of carrying out the provisions of the bond and lease, and were equal partners in that respect. The defendant strenuously urges that this did not amount to a partnership, but that plaintiff and defendant were simply tenants in common, each having his several interest, and that none of the elements of a mining partnership entered into the transaction. A mining partnership has been defined by this court as follows:

"A mining partnership is held to exist where the several owners of a mine co-operate in the working of the mine."—*Charles v. Eschleman*, 5 Colo. 111.

"A mining partnership may exist as well where the parties have an interest merely in the working of the mine or in carrying on mining operations as where they own the mine itself."—*Manville v. Parks*, 7 Colo. 128.

In the same case it is said:

"For many years both English and American authorities have held that co-tenant owners, as well as lessees or parties having only equitable interests in the property, or holding under license to work or develop, or where the owner furnishes the mine and another the capital and labor, under an agreement to

share the profits of the mine jointly, in all such cases there may be a partnership for mining purposes."

In *Higgins v. Armstrong*, 9 Colo. 38, it is said:

"The testimony, however, does not warrant the inference that it was an ordinary or commercial partnership, since no partnership organization was shown. It appears to have been an association of individuals for the purpose of prosecuting a certain business venture, which was the operating of mines and smelting works at Leadville. It may, therefore, be appropriately denominated a 'mining partnership,' since the business related to mining projects. It was held in *Charles v. Eschleman*, 5 Colo. 111, that a mining partnership exists where the several owners of a mine co-operate in the working of the mine. Here the several owners in the 'concern,' as Mr. Higgins calls it, co-operated in carrying on certain mining operations."

In *Lyman v. Schwartz*, 13 Col. App. 318, it is said:

"It appears that the defendants were jointly engaged in working a mine, and that three of them agreed to contribute the money and the other his services, and that they were to share equally in the result if there was any result. This agreement shows a mining partnership."

In *Meacher v. Reed*, 14 Colo. 351, it is stated as a general rule that when two or more persons acquire mining property solely or principally for the purpose of extracting the ore, the relation existing between them in the transaction of their common business is a mining partnership.

From these rules, the allegations of the complaint, the admissions of the answer, and the undisputed facts appearing in the record, it is quite apparent that there was a mining partnership existing between the parties.

Shortly after the bond and lease was made the parties commenced working the claim, the defendant himself working and the plaintiff employing a man to work in his stead. This arrangement continued until the 16th of the following December. Shortly after they became engaged in the enterprise they conceived the idea of forming a corporation to take over the property and some other mining claims in which the plaintiff and defendant were jointly interested. The articles of incorporation were prepared by the plaintiff, and were finally signed and acknowledged by the plaintiff and defendant and a third party on the 23rd of October. The corporation was formed under the laws of Wyoming. Some time after the 23rd of October—the exact date does not appear in the record—the articles were filed in the office of the secretary of state of the state of Wyoming. About the first of October the defendant gave to the plaintiff one hundred dollars, which the defendant testified was given for the purpose of enabling the plaintiff to purchase the claim outright from Gaskill. Plaintiff says that the one hundred dollars was given to him by defendant to be used in paying the expenses of the company. He says that the total disbursements were $328.10, of which the defendant contributed one hundred dollars and plaintiff the balance. On the 24th of October Gaskill went into the office of the plaintiff, and plaintiff then negotiated with him for the purchase of the mine, and finally bought it for $75.00 in cash and $25.00 to be taken in stock of the corporation which was then in process of formation. While the defendant alleges in his answer that he purchased the property from Gaskill, and while he testifies that he gave the $100.00 to the plaintiff for the purpose of purchasing the property, Gaskill says that the defendant never spoke to him concerning it, that the only talk he had

with either of the parties in relation to the purchase of this property was the one he had with plaintiff at the time the sale was made. Plaintiff also testified that the money which he paid to Gaskill for the property was his own money and did not belong to the company. As tending to support the theory of plaintiff, it appears that, after the articles of incorporation were filed in Wyoming, there was a dispute between the parties as to taking such steps as were necessary in order to authorize the corporation to do business in Colorado, plaintiff in his complaint alleging that this was through the fault of the defendant, and defendant in his answer asserting that it was the fault of the plaintiff. According to the pleadings there was some controversy as to the raising of the money to pay the necessary filing fees in this state, and, in this connection, defendant in his answer says:

"That upon his part he has fully desired and uniformly urged that the said incorporation be completed and perfected promptly and finally, and has told the plaintiff, who is an attorney, to go ahead and get this done, and if without funds of his own, to pay such expenses from money of the defendant in his, the plaintiff's, hands, and defendant alleges that money of defendant's in an amount sufficient for this purpose was and is in his, the plaintiff's, hands."

The only money which was placed in plaintiff's hands by the defendant was the one hundred dollars above referred to, and the difficulty concerning the filing of the papers in Colorado arose subsequently to the purchasing of the property from Gaskill; so that if we take the allegations of the answer most strongly against the pleader, as is the usual rule, we are forced to conclude that the one hundred dollars was not placed in the plaintiff's hands for the purpose of buying this property, but for the purpose, as

alleged and testified to by the plaintiff, of contributing to the general expense of the company. The plaintiff who prepared the deed from Gaskill, put the name of the defendant in as the sole grantee. He explains this by saying "the deed was made to Mr. Bruce because it was understood between Mr. Bruce and myself that this property, as well as others we were working on then, should go to the company, and the only reason I did not make the deed to us jointly was that Mr. Bruce was up at the mine working, and I thought it would please him if I would put it in his name. This was the only reason; there was no other reason." Some time later the plaintiff prepared a draft of some by-laws for the corporation and the minutes of a proposed meeting to be held by the board of directors. In these minutes it was provided that the defendant should convey the mining claim to the corporation in consideration of a certain amount of stock to be issued to the plaintiff and the defendant. Upon the 15th day of December defendant called at plaintiff's office for the purpose of reading over the by-laws and this draft of the minutes, and when he came to that portion which provided for the conveying of the property to the company, he objected and refused to make the conveyance. The difficulty then arose as to perfecting the organization so that it might do business in this state.

Plaintiff brought this action, alleging the facts substantially as above, and asking that defendant be compelled to convey one-half of the property to him. The court found the issues for the defendant, and plaintiff appeals.

It is contended by the plaintiff that the facts above stated constitute the defendant a trustee, and that a resulting trust exists for the use and benefit of the plaintiff. Defendant denies this, and says that the whole agreement was void because some

memorandum of it was not made in writing. From the entire transaction it is apparent that the defendant is endeavoring to practice a fraud upon the plaintiff. The deed for this property having been made to the defendant at the instance of the plaintiff because, as plaintiff says, he thought it would give the defendant pleasure, and the conveyance having been made for a temporary purpose simply to hold the property until the corporation was authorized to take the same, defendant in effect says, "now, having the property in my own name, I will not convey to the company nor to you, because the statute of frauds provides that any agreement which I might have made concerning the same was void because it is not in writing." This will not do. The statute of frauds was meant to prevent frauds, and not to encourage them. That fraud always takes the case out of the statute is a rule too well settled to admit of dispute. A party can not allege nor rely upon the statute of frauds for the purpose of committing fraud, but the statute is to be invoked for the purpose of preventing the commission of one.— *Lipscomb v. Nichols,* 6 Colo. 293; Brown Stat. F., § 438; *Jenkins v. Eldridge,* 3 Stor. (C. C.) 181; *Hidden v. Jordan,* 21 Cal. 93.

It has been frequently stated that resulting trusts, or those created by operation of law, are, first, when an estate is purchased in the name of one person, but the money or consideration is given by another; second, where a trust is declared only as to part, and nothing is said as to the rest; and, third, in certain cases of fraud where transactions have been carried on *mala fide.—Lloyd v. Spillett,* 2 Atkyns 150; 1 Greenl. Ev., § 266; Washb. R. P., § 1422; *Trapnall's Admx. v. Brown,* 19 Ark. 39.

Constructive trusts are such as are raised by equity in respect to property which has been acquired

by fraud; or where, although acquired without fraud, it is against equity that it should be retained by him who holds the legal title.—Washb. R. P., § 1430.

Resulting trusts are not within the statute of frauds, and may be shown by parol testimony.—*Knox v. McFarren,* 4 Colo. 586; *Kayser v. Maughan,* 8 Colo. 232; *Bohm v. Bohm,* 9 Colo. 100; *Warren v. Adams,* 19 Colo. 515.

Upon the failure to perfect the corporation it is apparent that a resulting trust exists in this case, whatever view we may take of it. If we say that the trust exists where the purchase price was paid by one and the deed made to another, then by a strong preponderance of the testimony it is clear that the plaintiff comes within the rule. He says that he paid his own money for this property; Gaskill says that he did not know Bruce in the transaction, that he had no conversation with him concerning the purchase of the property; the defendant says that he gave plaintiff one hundred dollars. In his answer he asserts that at the time of the commencement of this action, long after the purchase was made, the plaintiff had money in his hands sufficient to pay the expense of perfecting the corporation. Plaintiff could not have paid defendant's money to Gaskill and still retain it. Against this is the naked declaration of the defendant that he gave the one hundred dollars for the specific purpose of purchasing the property. Besides this, the property was purchased upon the 24th day of October; yet plaintiff and defendant continued to work the mine jointly, plaintiff furnishing a man and defendant himself working, until the 16th day of December, and until the defendant determined that he would not convey the property. If we consider the *mala fides* of the transaction, then it appears that in equity and good conscience defendant should convey one-half of this property to the plaintiff. These peo-

ple were engaged in a mining partnership for the purpose of working, operating and obtaining title to this particular claim, and each was to contribute to the expenses incident thereto. Pursuant to that arrangement the plaintiff negotiated with the owner of the property and purchased it outright and, unwisely as it appears, had the deed made to the defendant. Under such circumstances, should the defendant be permitted to cozen the plaintiff out of the property entirely, and at the same time accept the fruits of the labor bestowed upon, and money invested in, this property by the plaintiff? The court, under the pleadings and the evidence in this case, should have found the issues for the plaintiff instead of the defendant; and, not having done so, the judgment will be reversed and the cause remanded with instructions to render a decree for the plaintiff, in accordance with the prayer of the complaint.

*Reversed and remanded.*

Chief Justice Steele and Mr. Justice Goddard concur.